No. 02-544

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 111

IN THE MATTER OF J.C.B. and L.E.C.,

Youths in Need of Care.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
                In and For the County of Yellowstone, Cause No. DN 2000-037,
                Honorable Russell C. Fagg, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

        Roy W. Johnson, Attorney at Law, Billings, Montana

        For Respondent:

        Honorable Mike McGrath, Attorney General; Jennifer Anders, Assistant
        Attorney General, Helena, Montana

        Dennis Paxinos, County Attorney, Billings, Montana

        Patrick E. Kenney, Attorney at Law, Billings, Montana (Guardian Ad Litem)

                                Submitted on Briefs:  March 4, 2004

                                        Decided:   April 27, 2004

Filed:

        _____
                            Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 The Appellant, father B.C., appeals from the April 25, 2002, findings of fact, conclusions of law, and order entered by the Thirteenth Judicial District Court, Yellowstone County, which terminated his parental rights with respect to both J.D.B. and L.E.C. We affirm.

¶2 The sole issue presented by the father is whether the District Court abused its discretion in terminating his parental rights.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 B.C. is the father of two boys, J.D.B. and L.E.C., who are the subject of this action. The boys have different mothers. J.D.B. was born in 1986 as a result of a brief relationship between B.C. and L.B. B.C. claimed he did not know he had a son until two and one-half years after his birth. J.D.B. lived with his mother for several years in Wyoming, Washington, and Texas until she was incarcerated in Texas for possession of methamphetamine. After living with his maternal grandparents for a year, J.D.B., then seven or eight years old, went to live with his father, B.C., who agreed to adopt him.

¶4 L.E.C. was born to B.C. and R.R. in 1997, when J.D.B. was eleven years old. B.C. and R.R. lived together for several years before they separated. Following their separation, they shared custody of L.E.C.

¶5 During the six years prior to 2000, when the present proceedings were initiated, the relationship between J.D.B. and his father significantly deteriorated. On April 3, 2000, the Department of Public Health and Human Services (DPHHS) filed a Petition for Temporary

2

Investigative Authority (TIA) relative to J.D.B. and L.E.C., who were then thirteen and two years old, respectively. The petition sought to remove J.D.B. and L.E.C. from their father's care based on a report that B.C. was verbally and physically abusive to J.D.B. The report indicated that: (1) B.C. constantly assailed J.D.B. with put downs such as "dumb," "stupid," and "fucking idiot," kicked him with cowboy boots, and regularly inflicted pinch marks and other bruises in the shape of a belt; (2) B.C. was verbally abusive to school personnel when they requested his help in testing J.D.B. for severe attention deficit disorder with hyperactivity (ADHD); and (3) B.C. was verbally abusive to DPHHS staff when they tried to intervene. Following a severe beating incident, J.D.B. told investigators he did not want to see his father ever again. DPHHS made an emergency removal of both children. However, L.E.C. was returned to his father's care the following day when it was determined that L.E.C., as the favored child, had not been subjected to the same abuse as J.D.B., and, therefore, the risk level to L.E.C. was not sufficient to keep him in foster care. R.R. subsequently relocated to Idaho with L.E.C., retaining primary custody of L.E.C., with supervised visits to B.C.

¶6     DPHHS filed a Petition for Temporary Legal Custody of J.D.B. and L.E.C. on July 26, 2000. B.C. stipulated that temporary legal custody be granted to DPHHS regarding J.D.B., but contested temporary legal custody regarding L.E.C. After a hearing on August 31, 2000, the District Court declared both children youths in need of care within the meaning of § 41-3-102, MCA, and granted temporary legal custody to DPHHS for a period of six months. Further, the District Court signed a treatment plan which ordered B.C. to: (1)

3

participate in counseling and attend classes on parenting and anger management in an effort to establish a healthy, nurturing relationship with J.D.B.; (2) establish a more cooperative relationship with school staff regarding an upcoming individual education plan for J.D.B.; and (3) maintain appropriate family connections through visitation. The court also signed a treatment plan for J.D.B.'s mother.

¶7 On March 8, 2001, DPHHS moved the District Court to terminate the father's and the mother's parental rights on grounds that the proposed treatment plans were neither complied with nor successful, rendering the parents unfit, unable or unwilling to give the youths adequate parental care; that the parents' conduct appeared unlikely to change within a reasonable time; and that continuation of the parent-child relationship likely would result in continued abuse or neglect of both J.D.B. and L.E.C. L.B. subsequently signed a waiver of her parental rights to J.D.B.

¶8 The District Court conducted a three-part hearing on the petition on September 11, 2001, October 3, 2001, and October 15, 2001, at which time testimony was heard from two case managers, three DPHHS social workers, an administrative officer from Child Family Services, an anger management counselor, a clinical school psychologist, an adolescent psychiatrist, J.D.B.'s therapist, B.C.'s therapist, J.D.B.'s biological mother and grandmother, L.E.C.'s biological mother, and B.C.

¶9 On April 25, 2002, the District Court entered findings of fact, conclusions of law, and order terminating the parental rights of B.C. relative to both J.D.B. and L.E.C., and awarding permanent custody to DPHHS with the lawful authority to consent to the adoption of the

4

children. B.C. appeals. The parental rights of J.D.B.'s mother are not the subject of this appeal.

## STANDARD OF REVIEW

¶10 We review a district court's decision to terminate parental rights to determine whether the court abused its discretion. *In re A.T.*, 2003 MT 154, ¶ 9, 316 Mont. 255, ¶ 9, 70 P.3d 1247, ¶ 9. The test for an abuse of discretion is "whether the trial court acted arbitrarily, without employment of conscientious judgment, or exceeded the bounds of reason resulting in substantial injustice." *In re D.V.*, 2003 MT 160, ¶ 14, 316 Mont. 282, ¶ 14, 70 P.3d 1253, ¶ 14 (quoting *In re K.C.H.*, 2003 MT 125, ¶ 11, 316 Mont. 13, ¶ 11, 68 P.3d 788, ¶ 11). However, because a parent's right to the care and custody of a child is a fundamental liberty interest, it must be protected by fundamentally fair procedures. *D.V.*, ¶ 14. To satisfy the relevant statutory requirements for terminating a parent-child relationship, a district court must make specific factual findings. *D.V.*, ¶ 14. We review those findings of fact to determine whether they are clearly erroneous. *D.V.*, ¶ 14. Finally, we review the court's conclusions of law to determine whether the court interpreted the law correctly. *D.V.*, ¶ 14. It is not this Court's function to reweigh conflicting evidence or substitute its judgment regarding the strength of the evidence for that of the district court. *In re A.F.*, 2003 MT 254, ¶ 24, 317 Mont. 367, ¶ 24, 77 P.3d 266, ¶ 24.

## DISCUSSION

¶11 B.C. asserts the District Court abused its discretion in terminating his parental rights. First, B.C. contends that the District Court failed to acknowledge that a parent's right to the

care and custody of a child is a fundamental liberty interest which must be protected by fundamentally fair procedures. While it is true the District Court's order does not specifically address this fundamental liberty interest, the court did apply the statutory criteria for parental termination as required by § 41-3-609, MCA, which provides:

> **41-3-609. Criteria for termination**. (1) The court may order a termination of the parent-child legal relationship upon a finding . . . that any of the following circumstances exist:
> . . .
> (f) the child is an adjudicated youth in need of care and both of the following exist:
> (i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and
> (ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time.
> (2) In determining whether the conduct or condition of the parents is unlikely to change within a reasonable time, the court shall enter a finding that continuation of the parent-child legal relationship will likely result in continued abuse or neglect or that the conduct or the condition of the parents renders the parents unfit, unable, or unwilling to give the child adequate parental care. In making the determinations, the court shall consider but is not limited to the following:
> . . .
> (b) a history of violent behavior by the parent;
> . . .
> (3) In considering any of the factors in subsection (2) in terminating the parent-child relationship, the court shall give primary consideration to the physical, mental, and emotional conditions and needs of the child.

¶12 A review of the District Court's findings, conclusions, and order reveals that the court's Conclusions of Law Nos. 7 to 9, which concluded that it was "in the best interests" of both J.D.B. and L.E.C. to terminate parental rights, were supported by numerous findings of fact: J.D.B. had been severely abused by B.C., both verbally and physically; J.D.B. suffered from ADHD, but B.C. refused to assist school officials with the necessary

6

educational assessments to help J.D.B. be successful in school; as a result of the strained relationship with his father, J.D.B. was depressed and did not want to see his father again; L.E.C. suffered from an antisocial personality disorder as a result of B.C.'s ineffective parenting procedures; L.E.C. was at risk because he was either present or had knowledge of his brother's verbal and physical abuse; B.C. had a significant anger problem; and B.C. did not successfully complete the goal of his treatment plan requiring improvement of the emotional relationship with J.D.B., thus, rendering him unwilling, unable or unfit to parent his children. These findings indicate the District Court properly performed the "best interest of the child" analysis as required by § 41-3-609(3), MCA: ". . . the court shall give primary consideration to the physical, mental, and emotional conditions and needs of the child." On this basis, we conclude B.C. did not carry his burden of establishing that the court abused its discretion by failing to follow fundamentally fair procedures in terminating his parental rights.

¶13     B.C. also asserts the District Court abused its discretion in giving credence to J.D.B.'s testimony regarding the number of beatings which occurred. J.D.B. testified that he had been assaulted 80 or 90 times by his father. B.C. testified he only beat J.D.B. once. The court stated, "this is a difficult case, partially because there are two different stories that have evolved from [B.C.'s] evidence as opposed to [J.D.B.'s], in particular, and they're diametrically opposed, so somebody's not telling the truth." As the State correctly notes, "[t]his case largely boiled down to a credibility match between father and son: father

minimized the extent of abuse, claiming he only beat his son on one occasion, while the son testified that the abuse was ongoing and significant."

¶14  The District Court found J.D.B. to be a credible witness and chose to believe J.D.B. Numerous professionals testified that J.D.B.'s psychological profile was consistent with someone who had been physically and emotionally abused over a long period of time. The District Court was in the best position to hear all of the evidence presented and weigh conflicting testimony. "In nonjury trials, the credibility of a witness and weight which his or her testimony should be afforded is left to the sound discretion of the district court." *In re Inquiry into M.M.* (1995), 274 Mont. 166, 171, 906 P.2d 675, 678. It is not the role of this Court to reweigh the evidence and substitute our judgment for that of the District Court under such circumstances. We therefore conclude the District Court did not abuse its discretion in placing more weight on J.D.B.'s testimony than on B.C.'s.

¶15  B.C. further asserts that the court's Finding of Fact No. 26, which states that B.C. did not successfully complete the first goal of the treatment plan, specifically, successful anger management, is erroneous. Finding of Fact No. 26 was based upon the following testimony of Michael Roseborough, anger management counselor at Beta Alternatives where B.C. had been attending classes:

> While [B.C.] had completed the anger management classes, [B.C.] was unable to demonstrate changes in his behavior. [B.C.] minimized his own behavior, was not willing to admit that he had an anger management problem and had not made any sincere or long-lasting changes.

B.C. argues that a letter written by Roseborough at the conclusion of B.C.'s anger management class which stated B.C. had completed all sixteen steps of the anger management program and that Roseborough had "[n]o concerns at this time," should have been given more weight than Roseborough's oral testimony at trial.

¶16 However, at trial Roseborough testified that, in light of J.D.B.'s testimony of extensive and severe discipline, B.C. had not been completely open and honest in the anger management classes:

> If those disclosures [from the child] are indeed true, then it would indicate to me that [B.C.] had not been honest in the course of the class because there had been no talk of beatings, per se, of the–or of extreme disciplinary action. If what his son is saying is true, that there were as many as 80 beatings, as he calls them, then that to me is pretty dramatic and pretty extreme. Really nothing like that ever came up in class in terms of openness and honesty.
>
> . . . .
>
> [B.C. never made] any deep personal change or any desire for change in a significant way in terms of how [B.C.] disciplined his children through the course of the class. . . . There was really never any indication or heartfelt desire to change his way of disciplining his children.

As previously noted, credibility determinations are within the trial court's discretion, and here, the District Court acted within its discretion in placing more weight on Mike Roseborough's oral testimony than his earlier letter. We conclude Finding of Fact No. 26, that B.C. did not successfully complete the first goal of his treatment plan, was not clearly erroneous.

9

¶17 Finally, B.C. asserts the District Court erred in failing to consider the testimony of Cheryl Leicht, his therapist, in its decision to terminate his parental rights. B.C. argues that she was a well-qualified professional who, after seeing B.C. for approximately one year, offered significant testimony favorable to B.C. At trial, however, Cheryl Leicht admitted she had not personally witnessed B.C.'s anger problem, and she agreed that if J.D.B.'s testimony were true regarding the extent of the beatings, that fact could contribute to J.D.B.'s lack of trust with his father. Again, it was the function of the District Court to accept or reject conflicting evidence and to determine the weight to be given Leicht's testimony. Clearly, substantial evidence supported the District Court's findings.

¶18 We conclude the District Court did not abuse its discretion in terminating B.C.'s parental rights to J.D.B. and L.E.C. Affirmed

/S/ JIM RICE

We concur:

/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ PATRICIA O. COTTER
/S/ JIM REGNIER