No. 03-813

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 46

IN RE THE MARRIAGE OF

YVONNE S. EPPERSON,

        Petitioner and Appellant,

   and

ROBERT H. EPPERSON,

        Respondent and Respondent.

APPEAL FROM:    District Court of the Nineteenth Judicial District,
                     In and for the County of Lincoln, Cause No. DR 2002-081
                     The Honorable Michael C. Prezeau, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

                Peter F. Carroll, Attorney at Law, Kalispell, Montana

        For Respondent:

                David W. Harman, Attorney at Law, Libby, Montana

                           Submitted on Briefs:  April 7, 2004

                                  Decided:  February 23, 2005

Filed:

_____

                           Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 Yvonne Epperson (Yvonne) seeks reversal of the District Court's resolution of several issues pertaining to the dissolution of her marriage from Robert Epperson (Robert). She also requests a remand for a new trial before a new judge, claiming that the District Court judge who presided over this case was biased against her. We affirm.

## ISSUES

¶2 A restatement of Yvonne's issues is:

¶3 1. Did the District Court err when it terminated the parties' irrevocable trusts as a result of the dissolution of the marriage?

¶4 2. Did the District Court abuse its discretion by designating Robert as the custodial parent of the minor children?

¶5 3. Did the District Court abuse its discretion when it failed to conduct a child support calculation?

¶6 4. Did the District Court err when it failed to award Yvonne maintenance?

¶7 5. Was the District Court biased against Yvonne and, if so, was such bias so prevalent as to warrant a new trial?

## FACTUAL AND PROCEDURAL BACKGROUND

¶8 The Eppersons were married in 1975. Seven children were born to the marriage and at the time of dissolution in October 2003, four had reached the age of majority and three were minors. The ages of the three minor children at the time of dissolution were 10, 12 and 13 years.

2

¶9 During the years the Eppersons were married, the family moved many times before finally settling in Bull Lake Valley, Montana, in 1992. Throughout the marriage, they lived a somewhat self-contained existence in which Yvonne home-schooled the children and they had little contact with other children or with any persons outside of the Tridentine Catholic faith. Prior to their parents' separation, the children did not participate in organized sports activities. The family had no television or telephone but at some time did acquire a computer to which the children had limited access. When the older boys reached age sixteen, they opted to stop their "formal" education and go to work for their father in his logging and construction business. The older daughter continued her education to approximately age eighteen.

¶10 In 1999, the Eppersons executed two irrevocable trusts--the Mary's Way Trust and the Bent Wrench Trust. The corpus of the Mary's Way Trust was approximately 60 acres of timbered land in the Bull Lake Valley. The family had developed the land to include a large log home, several out-buildings, a fish pond, an income-generating blueberry patch and an orchard. The Bent Wrench Trust consisted of the machinery, equipment, vehicles and tools primarily used in Robert's business. Both trusts contained a "purpose" provision which stated: "The grantors established this trust for their family, consisting of the persons identified below, because they have contributed substantially and materially to the process of acquiring the property and are, therefore, the equitable owners thereof." The couple's seven children were then listed as the "family" and beneficiaries of the trusts. Yvonne was

3

to get annual income distributions from the Mary's Way Trust , and Robert was to get annual distributions from the Bent Wrench Trust.

¶11    In 2002, Yvonne filed a Petition for Dissolution asserting that the marriage was irretrievably broken.  She sought custody of the minor children.  Throughout the parties' separation and dissolution proceeding, all seven of the children became increasingly oppositional and defiant with Robert and professed to hate him and not want to see him or speak to him.  During this time, Robert moved to California where various members of his family, including a brother, resided.

¶12    A non-jury trial was conducted on August 6-7, 2003.  The District Court declined to rule from the bench and in September 2003, issued its fifteen-page, single-spaced Findings of Fact, Conclusions of Law, and Decree of Dissolution.  In this Decree, the court designated Robert as the custodial parent for the minor children.  It terminated the irrevocable trusts established by Yvonne and Robert and ordered that the corpuses of these trusts be distributed as marital property between Yvonne and Robert.  The court awarded a 2.5 acre parcel of the property to Yvonne and ordered the sale of the remaining real property with the proceeds being divided evenly between Robert and Yvonne.  Each party had the option to purchase items of equipment from the other party.  If neither party wanted the equipment, the equipment, too, would be sold with the proceeds divided equally.  Additionally, it determined that no maintenance would be awarded to Yvonne.

¶13    Yvonne filed a Motion to Amend the Judgment in which she moved to stay the transfer of the children to Robert and moved to stay the sale of the family property pending appeal. She also requested a new trial based, in part, on her perception that the District Court was biased against her. Robert opposed the Motion.

¶14    The District Court held a hearing during which both sides presented their positions and arguments. Subsequently, the court issued an Order in which it stayed the sale of the property pending appeal but required that the children go to Robert without further delay. Additionally, the court denied Yvonne's request for a new trial. On October 23, 2003, the District Court issued its Amended Findings of Fact, Conclusions of Law, and Decree of Dissolution (Decree). Yvonne filed a timely appeal.

¶15    We note that on November 28, 2003, approximately one month after Robert and the children moved to California, Robert filed an Affidavit informing the District Court that the relationship between he and his children had so deteriorated during the month that he had moved back to Montana with the children and had enrolled them in public school in Troy.

## STANDARD OF REVIEW

¶16    We review a district court's findings of fact to determine whether they are clearly erroneous. We review a district court's conclusions of law to determine whether that court's interpretation of the law is correct. *In Re Estate of Berthot*, 2002 MT 277, ¶ 21, 312 MT 366, ¶ 21, 59 P.3d 1080, ¶ 21 (citing *In re Mark K. Eggebrecht Irrevocable Trust*, 2000 MT 189, ¶ 18, 300 Mont. 409, ¶ 18, 4 P.3d 1207, ¶ 18).

5

¶17 Our standard of review for a district court's award of child custody is whether the district court's findings are clearly erroneous. When the findings are supported by substantial credible evidence, we will affirm the district court's decision unless a clear abuse of discretion is shown. *In re Marriage of Baer,* 1998 MT 29, ¶ 18, 287 Mont. 322, ¶ 18, 954 P.2d 1125, ¶ 18. The test for abuse of discretion is whether the trial court acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice. *State v. Baker*, 2004 MT 393, ¶ 13, 325 Mont. 229, ¶ 13, 104 P.3d 491, ¶ 13 (citation omitted).

## DISCUSSION

¶18 Did the District Court err when it terminated the parties' irrevocable trusts as a result of the dissolution of the marriage?

¶19 At the time Yvonne and Robert established the Mary's Way and Bent Wrench Trusts, they specifically designated these Trusts as "irrevocable." As the persons who established the Trusts, Yvonne and Robert were the "grantors" or "trustors." Yvonne and Robert were also the "trustees" of the Trusts and, as such, were charged with holding the Trust property and making annual distributions to themselves according to the terms of the Trusts. Their seven children were named as beneficiaries in each Trust.

¶20 During the dissolution proceeding, Robert sought termination of the Trusts arguing that the corpuses should be reclassified as marital assets and equitably distributed between he and Yvonne. He testified that the dual "family" purposes of the Trusts were to pass on

6

the family property to the children upon his and Yvonne's deaths, and to use the Trusts as estate planning tools allowing the beneficiaries to avoid probate and inheritance taxes.  He maintained that given the hostile circumstances in which the family found itself, such "family" purposes ceased to exist and the Trusts were no longer viable.  Yvonne did not rebut this testimony; instead she testified that the Trusts were intentionally irrevocable, which meant "that [she and Robert] were not going to change [their] minds, and that [they] wanted the children to have the property when [they] passed away."  As a result, Yvonne asserted that the Trusts should not be terminated.

¶21     There are limited methods by which an irrevocable trust may be modified or terminated.  Section 72-33-406, MCA, provides:

> (1) Except as provided in subsection (2), if all beneficiaries of an irrevocable trust consent, they may compel modification or termination of the trust upon petition to the court.
>
> (2) If the continuance of the trust is necessary to carry out a material purpose of the trust, the trust cannot be modified or terminated unless the court, in its discretion, determines that the reason for doing so under the circumstances outweighs the interest in accomplishing a material purpose of the trust. . . .

In the case before us, the beneficiaries did not unanimously request or consent to terminating the Trusts; rather, those beneficiaries who testified strongly opposed such termination.

¶22     Additionally, § 72-33-413(1), MCA, provides for the modification or termination of a trust.  It states:

> On petition by a trustee or beneficiary, the court may modify the administrative or dispositive provisions of the trust or terminate the trust if the continuation of the trust under its terms would defeat or substantially impair the

7

accomplishment of the purposes of the trust, whether by the imposition of tax, the allocation of beneficial interest inconsistent with such purposes, or by other reason. . . .

¶23   The District Court presided over several interim hearings as well as a two-day trial. The presiding judge, Judge Prezeau, in an apparent effort to understand the motives, concerns, and background of this family, engaged in extensive questioning of several of the witnesses, including Yvonne and Robert. During the hearings and the trial, the court heard conflicting testimony on many subjects. As we have stated on numerous occasions, the District Court is in the best position to hear the evidence and weigh any conflicting testimony that is presented. *In re Marriage of McKenna*, 2000 MT 58, ¶ 17, 299 Mont. 13, ¶ 17, 996 P.2d 386, ¶ 17. In nonjury trials, the credibility of a witness and the weight which his or her testimony should be afforded is within the sound discretion of the district court. We will not reweigh the evidence and substitute our judgment for that of the court under such circumstances. *In re J.C.B.*, 2004 MT 111, ¶ 14, 321 Mont. 110, ¶ 14, 88 P.3d 1280, ¶ 14 (internal citations omitted).

¶24   Based on the evidence presented throughout this proceeding, the court concluded that the true purpose of the Trusts was to avoid probate and inheritance taxes, as opposed to "rewarding the children for their work around the homestead." While recognizing the contribution of the children to the development of the property, the court observed that the labor was typical of that expected of rural children. The court further noted that, contrary to the Trust terms, the children contributed neither labor nor money to the acquisition of the

8

property to the extent that they were "equitable owners." The court also found that without the assets contained in the Trusts, there were "very few assets in the marital estate." As a result of the court's findings, its interpretation of the "purpose" of the Trusts and § 72-33-413, MCA, the court determined that the purpose of the Trusts was defeated by the disintegration of the family and that it was "unreasonable to continue the Trusts to the extreme detriment of one or both of the trustees."

¶25    We conclude that the District Court's factual findings regarding the limited existence of other marital assets and the children's contributions of labor toward the acquisition and development of the property were supported by the record; and are not otherwise clearly erroneous.

¶26    The District Court's application of § 72-33-413, MCA, to the Trust agreements constitutes a conclusion of law which we review for correctness. As observed by the parties, there is a complete absence of case law interpreting § 72-33-413, MCA.

¶27    Given the issues presented to him, Judge Prezeau was obligated to determine whether continuation of the Trusts would defeat or substantially impair the accomplishment of the purposes of the Trusts. Section 72-33-413(1), MCA. He determined, based upon the serious disintegration of this family, Robert's estrangement from the family, and the possibility that both Robert and Yvonne could experience "extreme detriment" if the assets of the Trusts were not distributed as marital property, that the "family purpose" of the Trusts was defeated. Based upon the record before us, we cannot conclude that the District Court either incorrectly

9

interpreted or applied the statute. To the contrary, the court carefully analyzed the evidence presented in light of the statutory directives. We therefore affirm the District Court's decision to terminate the Trusts.

¶28 Did the District Court abuse its discretion by designating Robert as the custodial parent of the minor children?

¶29 Yvonne challenges the District Court's decision to grant primary residential custody of the minor children to Robert. The District Court, in accordance with § 40-4-212, MCA, determined that such a custodial arrangement was in the best interests of the children. If the record supports the court's factual findings, absent an abuse of discretion, we will not disturb this determination.

¶30 Section 40-4-212, MCA, requires that a district court consider all relevant parenting factors in determining what parenting arrangement is in the best interests of the affected children. The statute then identifies thirteen factors that may be relevant to a particular case. While recommended, it is not mandatory that a district court's custody order contain specific findings on each of these listed factors. It need only "express the 'essential and determining' facts upon which it rests its conclusions." *Lorenz v. Lorenz* (1990), 242 Mont. 62, 68, 788 P.2d 328, 332 (citation omitted).

¶31 The District Court had the unenviable task of choosing between two parents who love their children but who have raised them in an intolerant, inflexible and isolated environment. To make this difficult decision, the court carefully considered each of the factors in § 40-4-

10

212, MCA, and, while not obligated to do so, issued specific findings on each factor. However, the court appeared to give substantial consideration to the following factors: 1) the wishes of the children; 2) frequent and continuing contact with both parents; 3) the developmental needs of the children; and 4) the lifestyle to which the children were subjected while living with both parents.

¶32 The court did not interview the minor children, but surmised that there was "no question" that, if asked, the children would express a strong preference to live with their mother. The court stated that while the children's wishes would normally receive some degree of deference, it did "not regard the children's estrangement from their father as a positive development which should be facilitated by the Court." The District Court further speculated that naming Yvonne as the residential parent "would be tantamount to terminating Robert's parental rights." The court observed that, "Yvonne can barely speak Robert's name, let alone be expected to promote or facilitate an ongoing relationship between Robert and the children." Noting that Yvonne displayed an extremely inflexible and judgmental demeanor and attitude, the court found that it had "infinitely more confidence that Robert will promote a healthy, respectful relationship between the children and their mother than it has in Yvonne's willingness or ability to do the same if the children were placed in her primary custody."

¶33 The court also gave significant consideration to the children's developmental needs. It noted that Yvonne had home-schooled the children throughout their lives with assistance

11

from Robert in the sciences. The court determined that if the children remained with Yvonne, their home-schooling might not provide them with an adequate educational basis to pursue college should they choose to do so. There is little doubt that the court was influenced by Robert's testimony that he would allow the children to go to school. The court found that it would be in the best interests of the children to be exposed to the outside world and to ideas that were "not first sifted through their parents' view of reality." The court also determined it was in their best interests under these circumstances to have their educational needs met outside of their home.

¶34 Lastly, the court appears to have seriously contemplated the lifestyle in which Robert and Yvonne raised their children. It observed that the family regularly shunned people for "minor transgressions" such as reciting the rosary or saying grace at their dinner table in an unacceptable manner. The court found that while both parents were intolerant and inflexible, Yvonne "has demonstrated that she is even less flexible and more intolerant than Robert." After Yvonne and Robert separated, Robert reconciled with his brothers, who had been ostracized at Yvonne's request. The court appreciated Robert's willingness and ability to reconcile with people he had formerly shunned. It observed that Yvonne had not demonstrated such a willingness to reconcile with people or a recognition that education was more important than indoctrination.

¶35 Our review of the record reveals that it supports the court's factual findings. Yvonne has failed to show that the District Court clearly abused its discretion. Where, as here, the

12

court properly considered the factors set forth in § 40-4-212, MCA, and set forth an analysis of the facts of the case to support its custody decision, there is no clear abuse of discretion. See *Marriage of McKenna*, ¶ 19.

¶36 Did the District Court abuse its discretion when it failed to conduct a child support calculation?

¶37 The court issued the following Finding regarding child support:

> Robert is presently unemployed, and Yvonne has not worked outside the home in 25 years. Under the circumstances, it is virtually impossible to calculate child support, and it is unlikely that Yvonne would pay it even if ordered to do so. In lieu of child support, the Court finds that Robert should receive the backhoe and dump truck, which he could use to earn a living or extra income with which to support the children. The backhoe has a value of approximately $16,000, its original purchase price, and the value of the dump truck is approximately $3,000.

¶38 Yvonne argues that the court erred by awarding property to Robert in lieu of child support without first calculating the amount of child support to which Robert was entitled under the Child Support Guidelines. Under § 40-4-204(1) and (2), MCA, a court is required to order a parent owing a duty of support to pay child support based upon consideration of various relevant factors. Section 40-4-204(3)(c), however, authorizes a court to decline imposing child support obligations. Under such circumstances, the court "shall state its reasons for not ordering child support." *In re Marriage of Kuzara* (1986), 224 Mont. 124, 129-30, 728 P.2d 786, 789.

¶39 The District Court in this case, based on the evidence presented, plainly stated its reason for not ordering child support. Therefore, we affirm the District Court and hold that

13

it did not abuse its discretion when it issued its Findings of Fact declining to calculate a precise child support amount.

¶40    Did the District Court err when it failed to award Yvonne maintenance?

¶41    Under § 40-4-203(1)(a) and (b), MCA, the district court has the discretion to award maintenance to a spouse seeking such maintenance providing the spouse "lacks sufficient property to provide for his reasonable needs; and is unable to support himself through appropriate employment . . . ." Here, the parties had extremely limited assets. The District Court granted to Yvonne a greater share of the marital assets. The court did this after considering that Robert had superior earning capacity, that Yvonne was providing a home for the older children and needed furnishings, and that Robert had taken some cash and/or gold with him when he left the family home. The District Court found that under such circumstances an equitable resolution would be to grant Yvonne a greater percentage of the assets.

¶42    The court then found that Yvonne had sufficient assets to provide for her reasonable needs. The court noted also that while Yvonne had never worked outside the home, had limited education, and may find it difficult to be in the workforce due to her "severe and judgmental attitude", she was, nonetheless, physically able to support herself through appropriate employment. As we have held previously, "maintenance awards are generally not favored in Montana." *Pfeifer v. Pfeifer* (1997), 282 Mont. 461, 472, 938 P.2d 684, 691. If they are granted, however, they must be granted pursuant to § 40-4-203, MCA. The

District Court determined under the applicable statute that an award of maintenance was not warranted. Again, the record supports the court's findings; and such findings are not otherwise clearly erroneous. Nor has Yvonne established that the court acted arbitrarily without employment of conscientious judgment or that it exceeded the bounds of reason resulting in substantial injustice. *Baker*, ¶ 13. We therefore affirm the District Court on this issue.

¶43 Was the District Court biased against Yvonne and, if so, was such bias so prevalent as to warrant a new trial?

¶44 There is no question that Judge Prezeau found fault with the lifestyle to which both Robert and Yvonne had subjected the children. Moreover, he did conclude, as noted above, that Yvonne would be less inclined than Robert to change that lifestyle for the better. However, we conclude that the court's findings and decisions were made carefully and thoughtfully on the basis of the substantial evidence presented, and that the record reveals no bias on the part of the court against Yvonne. Thus, no new trial is warranted.

## CONCLUSION

¶45 Affirmed.

/S/ PATRICIA O. COTTER

We Concur:


/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ JIM RICE
/S/ W. WILLIAM LEAPHART

Justice Jim Rice specially concurring.

¶46 I concur with the Court's holding and rationale, and therefore have signed the opinion. I write separately to offer comment regarding Issue 5, which asserts that the District Court was biased.

¶47 In resolving the child custody issue, the District Court reasoned as follows:

> Under the guise of protecting their children from drugs and immorality, the Eppersons home schooled their children, essentially denying them access to the outside world. They have no television, and until recently, had no telephone. . . . Robert's willingness to send the children to a public school at least opens up the possibility that the children will receive an adequate education and be exposed to ideas that are not first sifted through their parents' view of reality.

This statement, taken at face value, can easily be construed as a judicial assault upon the rights of parents to educate their children and to convey their morals and values to their children. It ridicules parental effort to protect children from drugs and immorality if such effort involves home-schooling and denial of access to worldly influences, faults a parental decision to have no television, faults the parents' choice of home-schooling over public education and criticizes parental efforts to transmit their "view of reality" to their children. If these things constitute impermissible parenting, then I submit that we have left freedom behind and are within the grip of the totalitarian state.

¶48 The District Court attempted to mitigate these comments, at least about home-schooling, by stating that "the Court wishes to make clear that it does not *automatically* assume that *every* home schooling situation is *necessarily* inferior to *every* public education situation." (Emphasis added.) However, this condition-laden explanation is less than convincing, and does not restore faith in the District Court's impartiality. Worse, the District

17

Court made no effort at all to mitigate its comments criticizing the transmission of the parents' views and values to their children.[1]

¶49 Further, the District Court made comments during the course of the trial about the parties' religion. During its own active examination of the witnesses, it formulated a question that described the parties as "a family of isolated religious fundamentalists." This description may very well have been accurate, but the court's later statements that the parties' religion had "screwball aspects" and was "off beat" would infer that it viewed fundamentalism in a negative light.[2]

¶50 In my view, these are inappropriate judicial comments. I would vote to reverse if I believed that the District Court's views on these matters led it to make an erroneous decision. However, upon review of this complex family matter, I believe the District Court's holding was supported by its consideration of evidence unrelated to the rights of this family to home-school, to insulate children from worldly influences, to convey moral values, and to worship as it pleased.

/S/ JIM RICE

---

[1] It should be noted that the record reflects the children were well adjusted to their environment and well educated, if not exposed to all the wonders of the world.

[2] Fundamentalism, as primarily defined, is a movement within twentieth century Protestantism which emphasizes a literal interpretation of the Bible as fundamental to Christian life and teaching. *See* Merrium-Webster's Collegiate Dictionary, Tenth Edition, 1998. In contrast, the record discloses that the Epperson family adhered to the Tridentine Catholic order or Tridentine Mass. A broader definition of fundamentalism is "strict and literal adherence of a set of basic principles." Ibid.