No. 05-549

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 208

IN THE MATTER OF M.H. and G.H.,

     Youths in Need of Care.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. CDJ 04-071
Honorable Kenneth R. Neill, Presiding Judge

COUNSEL OF RECORD:

    For Appellant (Father):

        Carl B. Jensen, Jr., Attorney at Law, Great Falls, Montana

    For Respondent:

        Hon. Mike McGrath, Attorney General; Jennifer Anders,
Assistant Attorney General, Helena, Montana

        Brant Light, Cascade County Attorney, Great Falls, Montana

    For Amicus Curiae:

        Kimberly A. Kradolfer, Special Assistant Attorney General,
Department of Public Health and Human Services, Helena, Montana

Submitted on Briefs:  June 28, 2006

Decided:  August 29, 2006

Filed:

_____
Clerk

Chief Justice Karla M. Gray delivered the Opinion of the Court.

¶1 The Eighth Judicial District Court, Cascade County, terminated the parental rights of the natural mother and father of M.H. and G.H. The father appeals. We affirm.

¶2 The father raises three issues on appeal:

¶3 1. Should this proceeding be dismissed and M.H. and G.H. returned to him because the District Court failed to hold a timely show cause hearing?

¶4 2. Did the District Court err in denying the father's motion for a jury trial?

¶5 3. Did the District Court err in rejecting the father's claim that the Department of Public Health and Human Services (DPHHS) violated the Americans with Disabilities Act (ADA) by failing to accommodate his mental illness?

## BACKGROUND

¶6 In April of 2004, DPHHS removed three-month-old M.H. from his father's and mother's care and petitioned the District Court for emergency protective services. The affidavit supporting the petition stated DPHHS had received a report the father was placing Worcestershire sauce on M.H.'s lips to get him to drink from a bottle of milk. In addition, a Cascade County Health Department worker had reported the mother and father had been seen placing the baby on a pillow with his face down, despite having been warned not to do so because of the risk of Sudden Infant Death Syndrome, and swaddling him so tightly that there were indentions from the blanket on his body. The worker also reported the father was seen holding M.H. up in the air and shaking him without supporting the baby's neck.

2

Finally, the worker stated DPHHS had received an anonymous report that the parents had left M.H. alone in their apartment and were feeding him cow's milk instead of formula or breast milk. The father purportedly told the anonymous reporter he shook M.H. to get M.H. to stop crying.

¶7 The District Court adjudicated M.H. a youth in need of care in August of 2004, and the mother, father and DPHHS agreed to court-approved treatment plans for both parents. DPHHS also petitioned for--and the District Court granted--emergency custody of G.H. when he was born in January of 2005, based on the facts which led to M.H.'s removal from the home and on psychological evaluations of both parents which indicated neither had the ability to parent. The District Court adjudicated G.H. a youth in need of care in April of 2005.

¶8 In June of 2005, DPHHS petitioned for termination of the father's and the mother's parental rights. The father moved for a jury trial, but the District Court denied his motion. At the termination hearing, a DPHHS caseworker testified that neither the father nor the mother had completed a treatment plan. Regarding the father, she testified he had failed to complete treatment plan requirements that he obtain mental health counseling, complete anger management classes and attend scheduled visitations with his children.

¶9 Three mental health experts who had examined the father also testified at the termination hearing. All three experts offered multiple diagnoses of the father, including psychotic disorder; conduct disorder; attention deficit hyperactivity disorder; major depression; mixed personality disorder with narcissistic, antisocial and avoidant personality traits; noncompliance with treatment; and a history of substance abuse.

3

¶10 Licensed clinical psychologist Ned Tranel testified his examination of the father led him to conclude the father had chronic and, in some areas, lifelong handicapping conditions which are extremely resistant to change or therapeutic involvement. He opined the father's parenting behavior could not be significantly altered within a time that would meet the developmental requirements of a young child. He further opined that round-the-clock supervision would be required throughout the children's developmental years in order to keep them safe in the father's care.

¶11 Psychologist Patrick Davis testified he had examined both parents and concluded the father was not capable of parenting and would not be ready to parent independently, even with intensive services, for at least another two to three years. Davis opined the father would require someone in the home most days for the better part of the day for the foreseeable future before he would be able to parent, and would not be able to assume the role of parent within a reasonable time. Davis had observed a visitation between the parents and M.H., and reported that both parents "tended to become preoccupied with their own solitary play" with the toys available in the room rather than interacting with M.H.

¶12 Finally, the court heard testimony by psychologist Dr. Donna May Zook, who had been hired by the father's counsel to examine him. According to Zook, the father suffered one or more brain injuries as a child. On the basis of her examination and psychological testing, Zook testified that--because of the father's poor judgment--someone would have to be in his home with him "every minute" for at least six to nine months, and possibly a year or more, to bring him to a point at which he would be a minimally adequate parent. She conceded even that might not work.

¶13    The District Court concluded no treatment plan was necessary for the father because, based on the testimony of Drs. Tranel and Davis, the father could not assume the role of a parent within a reasonable time.  The court also found the father had not complied with an appropriate court-approved treatment plan, the plan was not successful, and the conduct or condition of the father was unlikely to change within a reasonable time.  On those bases, the court terminated the father's parental rights to M.H. and G.H.  The court terminated the mother's parental rights for similar reasons.  The father appeals.

ISSUE 1

¶14    Should this proceeding be dismissed and M.H. and G.H. returned to the father because the District Court failed to hold a timely show cause hearing?

¶15    Section 41-3-301(6), MCA, requires a show cause hearing on a petition for emergency protective services to be held within 20 days of the filing of the initial petition unless otherwise stipulated by the parties.  In this case, DPHHS filed the petition for emergency protective services on April 23, 2004.  The show cause hearing was timely set for May 11, 2004.  In court on that date, the Cascade County Attorney's Office requested a continuance so counsel could be appointed to represent the mother and the father and, due to a County Attorney Office conflict of interest, the Montana Attorney General's Child Protection Unit could make an appearance on behalf of DPHHS. The court informed the parents the hearing would be continued.  The father neither objected to, nor stipulated to, the continuance.

¶16    The show cause hearing was held on July 6, 2004.  On appeal, the father contends the petition should be dismissed because that date was beyond the 20 days allowed after the petition was filed, pursuant to § 41-3-301(6), MCA.  On that basis, he also asks this Court to

5

order DPHHS to return M.H. and G.H. to him.

¶17 We generally do not consider issues raised for the first time on appeal, and we previously have applied that rule under circumstances similar to those present here. In *In re T.E.*, 2002 MT 195, 311 Mont. 148, 54 P.3d 38, a father whose parental rights had been terminated raised several issues for the first time on appeal, including an argument that he was denied fundamentally fair procedures when the district court failed to hold a show cause hearing within 20 days after the initial order removing the children from his home. Absent objection in the district court, we declined to consider the claimed statutory violations on appeal. *T.E.*, ¶¶ 17-24.

¶18 In the present case, the father did not object to the continuance on the date set for the first hearing or, indeed, at any time thereafter in the District Court. Therefore, we decline to address this issue further.

ISSUE 2

¶19 Did the District Court err in denying the father's motion for a jury trial?

¶20 Article II, Section 26 of the Montana Constitution provides "[t]he right of trial by jury is secured to all and shall remain inviolate." The father argues Article II, Section 26 entitled him to a jury trial in this case. In addition to citing some general rules of constitutional construction, the father quotes a statement from an 1897 case, *State v. Giroux*, 19 Mont. 149, 160, 47 P. 798, 801 (1897), that the tie between parent and child is "one of the most binding in human life" and should not be lightly disregarded. He also argues termination of parental rights is a process by which the State takes away the liberty of an individual and, as such, should be viewed in the same way as a criminal case, and not as a case in equity. Finally, the

6

father contends abuse and neglect proceedings employ imprecise substantive standards that leave determinations open to subjective opinion.

¶21 The father is certainly correct that parent-child bonds should not be lightly disregarded. Indeed, our cases stating a natural parent's right to the care and custody of his or her child is a fundamental liberty interest are legion. *See, e.g., In re A.N.W.*, 2006 MT 42, ¶ 34, 331 Mont. 208, ¶ 34, 130 P.3d 619, ¶ 34 (citation omitted); *In re V.F.A.*, 2005 MT 76, ¶ 6, 326 Mont. 383, ¶ 6, 109 P.3d 749, ¶ 6 (citation omitted); *In re J.C.B.*, 2004 MT 111, ¶ 10, 321 Mont. 110, ¶ 10, 88 P.3d 1280, ¶ 10 (citation omitted). The father fails to tie this important proposition to the jury trial right he asserts here, however.

¶22 Furthermore, adoption of the father's argument would require us to overrule *Matter of C.L.A.*, 211 Mont. 393, 685 P.2d 931 (1984), in which we held there is no right to a jury trial in civil proceedings to terminate parental rights. It also would require us to conclude that § 41-3-607(5), MCA, which expressly provides "[t]here is no right to a jury trial at proceedings held to consider the termination of a parent-child legal relationship," violates the Montana Constitution. With regard to the statute, we observe that a party asserting a constitutional challenge to a statute carries the burden of proving, beyond a reasonable doubt, that the statute is unconstitutional; any doubt is resolved in favor of the statute. *See City of Great Falls v. Morris*, 2006 MT 93, ¶ 12, 332 Mont. 85, ¶ 12, 134 P.3d 692, ¶ 12 (citation omitted).

¶23 In *C.L.A.*, we began by stating that the Montana Constitution guarantees the right to a jury trial only in cases in which that right was enjoyed when the Constitution was adopted. *C.L.A.*, 211 Mont at 396, 685 P.2d at 933 (citations omitted). We observed that, when the 1889 Montana Constitution was adopted, no right to a jury trial existed in civil proceedings

7

for termination of parental rights because no such proceedings existed at that time. We applied the same reasoning to the right to a jury trial under the 1972 Montana Constitution. *C.L.A.*, 211 Mont. at 396-97, 685 P.2d at 933. The right to trial by jury is guaranteed in virtually identical language in the 1972 Montana Constitution as it was in the 1889 Montana Constitution.

¶24 The father argues the reasoning used in *C.L.A.* is inconsistent with the intent of the founders of the State of Montana, and inconsistent with Montana's case law regarding the interpretation of constitutional provisions. As to the intent of the constitutional framers, we note that an amendment was offered during the 1972 Montana Constitutional Convention which would have extended the right to jury trial to all matters in both law and in equity; neglect and abuse proceedings were specifically discussed as a type of proceeding that would be affected. The delegates rejected the proposed amendment. *See* Montana Constitutional Convention, Verbatim Transcript, March 9, 1972, pp. 1788-92.

¶25 Moreover, we note that numerous sister jurisdictions also have concluded there is no right to a jury trial in a proceeding for termination of parental rights, because no right to a jury trial existed for such proceedings at common law. *See Alyssa B. v. State, Dept. of Health and Social Services*, 123 P.3d 646, 648-49 (Alaska 2005); *In re Lambert*, 86 A.2d 411, 412-13 (D.C. Mun. App. 1952); *Porter v. Watkins*, 121 S.E.2d 120, 121-22 (Ga. 1961); *E.P. v. Marion County Office of Family and Children*, 653 N.E.2d 1026, 1030-31 (Ind. App. 1995); *In Interest of Baby Boy Bryant*, 689 P.2d 1203, 1209 (Kan. App. 1984); *In re Shane T.*, 544 A.2d 1295, 1297 (Me. 1988); *Matter of Colon*, 377 N.W.2d 321, 328 (Mich. App. 1985); *State ex rel. Children, Youth and Families Dept. v. T.J.*, 934 P.2d 293, 297-98 (N.M.

8

App. 1997); *Matter of Ferguson*, 274 S.E.2d 879, 880 (N.C. App. 1981); *State in Interest of T. B.*, 933 P.2d 397, 400 (Utah App. 1997). In contrast, a right to jury trial in child protective proceedings exists in Oklahoma, because Oklahoma's state constitution expressly provides for a jury trial in juvenile proceedings. *See A.E. v. State*, 743 P.2d 1041, 1047 (Okla. 1987).

¶26 Furthermore, while some of the father's arguments might support legislative action to create a statutory right to a jury trial in parental rights termination cases, the 2005 Montana Legislature considered--and ultimately rejected--an effort to create such a statutory right to a jury trial in proceedings to terminate parental rights. *See* Mont. S.B. 408, 59th Leg. (Feb. 8, 2005). It is not our role to add to or delete from the terms and substance of the statutes which have been enacted by the Legislature. *See* § 1-2-101, MCA.

¶27 The father's arguments for overruling *C.L.A.* and declaring § 41-3-607(5), MCA, in violation of the Montana Constitution are not persuasive. We hold the District Court did not err in denying the father's motion for a jury trial.

ISSUE 3

¶28 Did the District Court err in rejecting the father's claim that DPHHS violated the ADA by failing to accommodate his mental illness?

¶29 Pursuant to 42 U.S.C. § 12132, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." A person who suffers a mental impairment which substantially limits one or more of his or her major life activities is protected under the ADA. *See* 29 C.F.R. § 1630.2(g). The father contends the District Court's determination that the accommodations

9

necessary to enable him to parent would be beyond the scope of the ADA was erroneous, without specifying the accommodations he feels would have been necessary. We recently rejected a similar argument.

¶30 In *In re J.B.K.*, 2004 MT 202, 322 Mont. 286, 95 P.3d 699, a mother whose parental rights had been terminated argued that, because of her developmental disability, DPHHS's failure to afford her additional time to complete her treatment plan violated the ADA. We noted we had not yet addressed whether the ADA applies to parental rights termination proceedings in Montana, and that several other state courts have found it unnecessary to answer that question in cases involving similar circumstances. *J.B.K.*, ¶¶ 24-25. Observing that the mother did not dispute that DPHHS had offered her every available service and attempted to accommodate her disability by allowing her to repeat a class and offering her individual classes based on a special needs program, we concluded DPHHS had taken the mother's disability into account in administering her treatment plan and in providing services. Notwithstanding its efforts, however, clear and convincing evidence established that she likely could not successfully complete treatment plans or become capable of parenting, even if given additional time. *J.B.K.*, ¶¶ 28-30. As a result, we did not further address the ADA claim.

¶31 The father does not address or try to distinguish *J.B.K.* Instead, he argues he suffers from a mental impairment that substantially limits his life activities so that he falls within ADA protections, and then states only generally that DPHHS did not make reasonable accommodations of his mental illness.

¶32 In the present case, two clinical psychologists testified that the father would not be

10

able to parent within a reasonable time, or the foreseeable future. A third psychologist testified someone would have to be in the home with the father "every minute" for at least six to nine months, and possibly a year or more, in order to get him to a point at which he would be a minimally adequate parent. The District Court stated "[s]ervices were provided to these parents, but the accommodations that would be necessary to keep these children safe would represent a fundamental alteration in services [DPHHS] provides and, therefore, beyond the scope of the ADA even if the Act applied in this case." We conclude the father has failed to establish error in the District Court's rejection of his claim that DPHHS violated the ADA by failing to accommodate his mental illness.

¶33    Affirmed.

/S/ KARLA M. GRAY

We concur:

/S/ JAMES C. NELSON
/S/ PATRICIA COTTER
/S/ BRIAN MORRIS
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE
/S/ JOHN WARNER