FILED

03/09/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0315

DA 20-0315

# IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 56

IN THE MATTER OF:

K.L.N.

A Youth in Need of Care.

APPEAL FROM: District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. DDN 18-008
Honorable John W. Parker, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Kelly M. Driscoll, Driscoll Hathaway Law Group, Missoula, Montana
(for Mother)

For Appellee:

Austin Knudsen, Montana Attorney General, Katie F. Schulz, Assistant
Attorney General, Helena, Montana

Joshua A. Racki, Cascade County Attorney, Matthew S. Robertson, Deputy
County Attorney, Great Falls, Montana

Submitted on Briefs: January 20, 2021

Decided: March 9, 2021

Filed:

_____
Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1     K.S. (Mother) appeals from the termination of her parental rights to her child K.L.N.[1]  The Eighth Judicial District Court, Cascade County, terminated Mother's rights to her child pursuant to § 41-3-609(1)(f), MCA, in its Order Granting Permanent Legal Custody, Termination of Parental Rights with Right to Consent to Adoption on May 18, 2020.  On appeal Mother raises the following issues:

> *1. Whether the Department of Public Health and Human Services, Child and Family Services Division (Department) and District Court failed to comply with the statutory requirements of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101-12213, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Section 504);*
>
> *2. Whether the District Court erred when it terminated Mother's parental rights under § 41-3-609, MCA, and 25 U.S.C. § 1912; and*
>
> *3. Whether the District Court erred when it adjudicated K.L.N. as a Youth in Need of Care (YINC) without applying the Indian Child Welfare Act (ICWA).*

¶2     We affirm the termination of Mother's parental rights to K.L.N.

## PROCEDURAL AND FACTUAL BACKGROUND

¶3     The Department has a long history with Mother.  Her parental rights to her first child were terminated in 2013 based on her inability to meet an infant's needs.  Mother has cognitive and developmental delays stemming from Fetal Alcohol Spectrum Disorder

---

[1] Mother also appeals from the termination of her parental rights to her other child, S.P., which the District Court terminated in the same May 18, 2020 Order.  We originally consolidated these cases at Mother's request on July 22, 2020.  After Mother's briefing was completed, S.P.'s birthfather moved to unconsolidate the cases on December 30, 2020, explaining he is not a party to the proceedings regarding K.L.N. as he is the birthfather of S.P. and not K.L.N.  We granted Father's motion and unconsolidated the cases on that same day.  We address the termination of Mother's rights to S.P. in a separate, unpublished opinion, *In re S.P.*, No. DA 20-0314.

2

(FASD). Mother's adoptive father (Grandfather) is Mother's guardian and conservator. In 2016, the Department began receiving reports during Mother's pregnancy with S.P., detailing concerns about Mother's ability to care for an infant and her significant other's anger issues. After S.P.'s birth, the Department began receiving reports Mother was unable to care for the infant, exposed S.P. to domestic violence, failed to provide S.P. with food and water, exposed her to unsanitary conditions, refused to return home and slept on the street with S.P. without proper clothing to protect S.P. from heat and insect bites, failed to change S.P.'s diaper for long periods of time, and left S.P. in the care of known child sex offenders. The Department put a Protection Plan in place with S.P. remaining in Mother's custody and Grandfather and his wife (Grandparents) serving as Safety Resources. The Department also referred Mother to Andrea Savage, LCPC, LMFT, CTF-CBT for Theraplay and Parent Child Interaction Therapy (PCIT). Savage completed her first parenting assessment of Mother in 2017. Despite this intervention, Mother continued to expose S.P. to known sex offenders and the Department removed S.P. from Mother's care on August 31, 2017, placing her with Grandparents. Following Mother's stipulation that S.P. was a YINC, the court adjudicated S.P. as a YINC and granted TLC to the Department on October 27, 2017. Mother stipulated to her treatment plan on December 5, 2017.

¶4　　K.L.N. was born in early 2018 and the Department removed her from Mother's care shortly after her birth, citing Mother's inability to care for an infant and the ongoing dependent neglect case with S.P. K.L.N.'s birthfather reported he is affiliated with the

3

Quinault Indian Nation (Tribe) and K.L.N. is an Indian Child under ICWA.[2] The Department sent notice of the proceedings to the Tribe and sought confirmation of K.L.N.'s membership status. The Tribe did not respond and did not participate in the proceedings. The adjudication hearing was continued several times. On August 14, 2018, upon Mother's stipulation, the court ultimately adjudicated K.L.N. a YINC, granted TLC to the Department, and ordered Mother to comply with the same treatment plan ordered in S.P.'s case. A Qualified Expert Witness (QEW) did not testify at the hearing and the court did not make the additional findings or apply the heightened evidentiary standards required under ICWA in its order.

¶5 After working with Mother for over a year, Savage completed a second parenting assessment in September 2018 and concluded Mother's cognitive capacities to independently parent her children remained unchanged. Savage did not believe Mother was able to make safe decisions for her children due to her poor judgment and impulse control and "does not present as ever going to be able to raise [S.P. and K.L.N.] on her own." Savage recommended Mother engage in individual counseling to address domestic violence patterns and to assist with cognitive understanding of herself. Mother started individual counseling with Angela Meyers, LCPC, LAC, in January 2019 based on Savage's recommendation. Meyers reported to the Department she was concerned about Mother's protective capacities as a parent.

---

[2] The District Court terminated the parental rights of K.L.N.'s birthfather in the same May 18, 2020 Order. He did not appeal the termination of his parental rights.

4

¶6 Following a hearing on June 4, 2019, the court extended TLC pursuant to Mother's stipulation. The Department petitioned to terminate Mother's parental rights under § 41-3-609(1)(f), MCA, on August 19, 2019. The Department sent notice of the termination proceedings to the Tribe. The court held a status hearing on September 3, 2019, and confirmed the termination hearing would go forward on September 24, 2019. Mother's counsel reported for the first time Mother objected to placement of the children with Grandparents, but he had not sought a contested placement hearing because he had "yet to find a way to effectively argue" Mother's objections under § 41-3-440, MCA. The Guardian Ad Litem (GAL) filed her report on September 19, 2019. The GAL opined it would be in the best interest of the children "to remain with their grandparents and continue their relationship with their mother should [Mother's] parental rights be terminated."

¶7 The initial termination hearing took place on September 24, 2019. Mother asked for a one-month continuance to allow the parties to discuss a possible guardianship, based on the GAL's opinion Mother should still be involved in the children's lives even if her parental rights are terminated. The Department asked to put on testimony from Savage and Meyers. Mother did not object.

¶8 Savage was aware of Mother's disability and had worked with parents with FASD previously and testified about how FASD can impact a person's ability to parent. Savage opined parents with FASD can parent with support around them, but they struggle to sustain the level of attention and care a parent must provide in the long term. Parents with FASD would need consistent monitoring and support, such as in-home services multiple

5

times a week to reinforce parental skills, ensure safety, and teach the parent how to interact appropriately with his or her child. Savage provided supervised visitation and PCIT to Mother for over two years. Savage had completed two parenting evaluations of Mother. She explained she had evaluated Mother using 21 specific tasks to assess Mother's ability to engage, challenge, nurture, and provide structure for a child. Savage testified she had worked with Mother to build parenting skills through PCIT since 2017, but Mother had not been successful. Savage explained the standards of PCIT do not recommend daily sessions and call for one-hour increments so as not to overwhelm the parent. Savage explained the quality of time spent together is more important than the quantity of time for developing the parent-child bond. Savage testified that while Mother had strong nurturing instincts, she was unable to provide basic structure and predictability for her children. Savage explained visits were moved from the Department to Grandparent's home because K.L.N. became dysregulated when alone with Mother and Mother was unable to calm her. Savage opined reuniting the children with Mother would place the children at serious risk of emotional harm.

¶9      Meyers testified she worked with Mother over a prolonged period and Mother never missed an appointment. Meyers agreed Mother was developmentally delayed, likely stemming from FASD. Meyers worked with Mother on issues related to domestic violence and protective capacity, forming and maintaining healthy relationships, and chemical dependency. Meyers testified that based on Mother's self-reporting, Mother had made improvements in her relationships, but Meyers continued to have concerns with Mother's

impulsiveness and poor judgment in entering into a new relationship while trying to reunite with her children. Mother had made improvements with attending to her own emotional needs, but Mother had minimal coping skills. Meyers opined it would be overwhelming to return the children to Mother's care. Meyers testified she had experience working with individuals with FASD. She explained individuals with FASD need a lot of repetition to change their behaviors. Meyers agreed it *could* have been beneficial to Mother to have seen her more often.

¶10 The court held another status hearing on December 3, 2019, at which the Department confirmed it was still moving forward with termination of Mother's parental rights. At the hearing, Mother's counsel asked for the court to order mediation between the parties under § 41-3-422(12), MCA, to discuss a possible guardianship. The court ordered briefing from the parties on the issue. After the hearing, Mother filed a Motion for Court Ordered Alternative Dispute Resolution on December 9, 2019, with an accompanying brief. In the brief, Mother argued the court should order the parties to participate in mediation because the Department would not be able to meet its burden to show it provided Mother with active efforts before terminating her parental rights. Mother argued the Department failed to provide her with reasonable accommodations under the ADA and Section 504 and failed to provide her with active efforts under ICWA because she had not been offered services or parenting assessment specifically tailored to treat FASD. The Department filed its response on December 20, 2019, arguing Mother's treatment plan already took her disability into account and the Department provided

7

Mother with active efforts through tailored services. The Department opposed the motion for mediation because the Department had already considered guardianship, but ultimately concluded adoption was more appropriate and noted Grandparents expressed a disinterest in guardianship and wanted adoption. The District Court denied Mother's motion to order mediation between the parties. The GAL filed a second report on December 24, 2019. The GAL observed Mother loves her children and does well at visits with them but is distrustful of Grandparents' intentions and they are distrustful of her parenting skills. The GAL supported a guardianship with Grandparents, but recommended Mother and Grandparents pursue counseling to address the concerns between them.

¶11 After several more continuances, the court held the second termination hearing on May 1, 2020. Anna Fisher testified as a QEW. She had reviewed the case file and testified if the children were returned to Mother's care, they would suffer serious emotional or physical damage. CPS Teresa Larson explained a trial home visit with Mother was not implemented because Mother had not made sufficient progress with her parenting skills. Larson explained Mother's parenting skills remained limited and neither Savage nor Meyers believed Mother would be able to improve. Kami Stone, the supervising CPS, opined Mother's treatment plan was not successful because neither Savage nor Meyers believed that Mother was capable of safely parenting her children full time or that she could gain sufficient skills to do so.

¶12 Mother testified on her own behalf. Mother testified about her ability to meet the daily essential requirements of parenthood, such as cooking, cleaning, and laundry. Mother

testified she had found stable housing a year prior, but no one from the Department had visited her home to ensure it was safe for children. Mother testified she never missed visitation with her children unless she was sick. She had voluntarily enrolled in and completed the Circle of Security parenting class. Mother testified the Department had not clearly communicated to her what she needed to do to reunite with her children and she had asked multiple times if there was anything more she could do and they told her no. Mother also called her husband, her adoptive mother, and a friend to testify on her behalf. All three testified in support of Mother being able to safely parent.

¶13 At the end of the hearing, the court stated it would take Mother's disability into account in making its determinations, relying on *In re J.B.K.*, 2004 MT 202, ¶ 30, 322 Mont. 286, 95 P.3d 699. The District Court issued its written order terminating Mother's parental rights to K.L.N. on May 18, 2020, making the additional findings and using the heightened evidentiary standards required by ICWA. The District Court found Mother was unlikely to change within a reasonable time based on the testimony of Savage and "mother's inability to establish a bond with the children, her inability to appropriately respond to the children, and her inability to parent the children."

**STANDARD OF REVIEW**

¶14 We review a district court's decision to terminate a person's parental rights for an abuse of discretion under both Title 41, chapter 3, MCA, and ICWA. *In re M.T.*, 2020 MT 262, ¶ 16, 401 Mont. 518, 474 P.3d 820. This Court reviews a district court's findings of facts for clear error and conclusions of law for correctness. *In re B.H.*, 2020 MT 4, ¶ 26,

9

398 Mont. 275, 456 P.3d 233. If the court's findings of fact are not clearly erroneous and if the court's conclusions of law are correct, we will not reverse a district court's decision to terminate parental rights unless we determine the district court abused its discretion. *In re B.H.*, ¶ 26.

## DISCUSSION

¶15 Mother challenges the termination of her parental rights under both state and federal law. We begin by laying out the applicable state and federal statutes at issue in this case and then turn to the issues raised by Mother on appeal.

### *Applicable State Law for Terminating Parental Rights*

¶16 A district court may terminate parental rights, if it determines a child has been adjudicated as a YINC, the parent failed to successfully complete an appropriate treatment plan, and the conduct or condition rendering the parent unfit is unlikely to change within a reasonable time. Section 41-3-609(1)(f), MCA.

¶17 We have repeatedly explained a treatment plan must "take[] into consideration the particular problems facing both the parent and the child." *In re A.N.*, 2000 MT 35, ¶ 27, 298 Mont. 237, 995 P.2d 427; *see also In re D.B.*, 2007 MT 246, ¶ 34, 339 Mont. 240 168 P.3d 691. The Department "has a duty to act in good faith in developing and executing a treatment plan to preserve the parent-child relationship and the family unit." *In re D.B.*, ¶ 33. "In the case of a disabled parent, an appropriate treatment plan considers the parent's disability and is customized to meet those particular needs." *In re X.M.*, 2018 MT 264, ¶ 19, 393 Mont. 210, 429 P.3d 920 (citing *In re D.B.*, ¶ 34).

10

¶18　Under state law, the Department must provide reasonable efforts to reunify families that have been separated by the State. *See* § 41-3-423(1), MCA. Reasonable efforts require the provision of services "reasonably designed to address the parent's treatment and other needs precluding the parent from safely parenting." *In re R.L.*, 2019 MT 267, ¶ 22, 397 Mont. 507, 452 P.3d 890. Among other things, reasonable efforts include the "development of individual written case plans specifying state efforts to reunify families" and the "provision of services pursuant to a case plan." Section 41-3-423(1), MCA. While not a separate termination standard that requires the district court to make a specific finding regarding the provision of reasonable efforts, the district court should consider whether reasonable efforts provided by the Department have been unable to rehabilitate the parent when determining the likelihood that a parent's conduct or condition will change in a reasonable time under § 41-3-609(1)(f)(ii), MCA. *See In re R.J.F.*, 2019 MT 113, ¶ 26, 395 Mont. 454, 443 P.3d 387. A district court's "conclusion that a parent is unlikely to change could be called into question if the Department failed to make reasonable efforts to assist the parent." *In re C.M.*, 2019 MT 227, ¶ 22, 397 Mont. 275, 449 P.3d 806.

### *Requirements of ICWA*

¶19　Under ICWA, the criteria for termination under § 41-3-609(1)(f), MCA, must be supported by evidence beyond a reasonable doubt. *See In re L.A.G.*, 2018 MT 255, ¶ 22, 393 Mont. 146, 429 P.3d 629; *see also* 25 U.S.C. 1912(f); § 41-3-422(5)(b), MCA. The court must also make additional findings required by ICWA. Unlike the requirement for reasonable efforts under state law, ICWA requires the district court to make a specific

finding "that *active efforts* have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d) (emphasis added). In addition, the district court must determine the continued custody of the child by the parent is "likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f). This determination must be supported by evidence beyond a reasonable doubt, including the testimony of a QEW. 25 U.S.C. § 1912(f).

### Requirements of the ADA and Section 504

¶20 A stated purpose of Congress in enacting the ADA is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1); *see also Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212, 118 S. Ct. 1952, 1956 (1998) (discussing the broad scope of the ADA and explaining "the fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." (internal quotation omitted)). Title II of the ADA prohibits a public entity from discriminating against a qualified individual with disabilities in the provision or operations of public services, programs, or activities. *See* 42 U.S.C. § 12132. Specifically, 42 U.S.C. § 12132 provides "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." The term "public entity" includes State and local government, as well as "any department, agency, special purpose

district, or other instrumentality" of State or local government. 42 U.S.C. § 12131(1). A qualified individual with a disability is

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2). Section 504 applies the same requirements to entities that receive federal funding. 29 U.S.C. § 794(a).

¶21 To avoid discrimination on the basis of disability, the ADA and Section 504 require public entities to make reasonable accommodations for qualified individuals with disabilities, "unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

¶22 *1. Whether the Department and District Court failed to comply with the statutory requirements of the ADA and Section 504.*

¶23 The parties do not dispute Mother has a disability under the ADA. On appeal, Mother and the Amicus Disability Rights Montana raise the issue whether and how the ADA applies to dependent neglect cases in Montana. Mother argues the Department failed to provide her with reasonable accommodations in the services it provided to her as required under the ADA and the District Court erred in failing to apply the ADA when terminating her parental rights.

¶24 This Court has not directly addressed the application of the ADA in termination of parental rights proceedings. We previously have held the requirements of the ADA to

13

provide reasonable accommodations were met by the Department's provision of services without determining the scope of the ADA's application to dependent neglect proceedings. *See In re M.H.*, 2006 MT 208, 333 Mont. 286, 143 P.3d 103; *In re J.B.K.*, 2004 MT 202, 322 Mont. 286, 95 P.3d 699.

¶25 "[S]ervices, programs, [and] activities of a public entity" encompasses most actions of public entities directed to the general public, and this includes the Department's involvement with families in dependent neglect cases. *See* 42 U.S.C. §§ 12101(b)(1) and 12132. We agree with numerous other courts the ADA requires the Department to make reasonable accommodations for those individuals with disabilities in the reunification services and programs it provides.[3] We conclude, however, the ADA requirements to provide reasonable accommodations are consistent with—and generally subsumed within—the requirements of Title 41, chapter 3, MCA, to provide reasonable efforts and to develop an appropriate treatment plan. *See In re D.B.*, ¶ 34 ("[T]reatment plans must be customized to meet the needs of disabled parents."); *In re D.B.*, ¶ 37 ("Where a parent suffers from a disability, [the Department] has a special duty to assist him or her in prioritizing and scheduling tasks."); *In re R.L.*, ¶ 22 ("Engaging in reasonable efforts requires the development and implementation of voluntary services and/or a treatment plan

---

[3] *See, e.g.*, *Lucy J. v. Dep't of Health & Social Servs.*, 244 P.3d 1099, 1115-16 (Alaska 2010); *In re S.K.*, 440 P.3d 1240, 1247-48 (Colo. Ct. App. 2019); *In re Elijah C.*, 165 A.3d 1149, 1164-66 (Conn. 2017); *In re H.C.*, 187 A.3d 1254, 1265 (D.C. 2018); *Adoption of Gregory*, 747 N.E.2d 120, 126 (Mass. 2001); *In re Hicks/Brown*, 893 N.W.2d 637, 640 (Mich. 2017); *In re K.C.*, 362 P.3d 1248, 1252 (Utah 2015).

reasonably designed to address the parent's treatment and other needs precluding the parent from safely parenting."). In other words, if the Department fails to take into account a parent's limitations or disabilities and make reasonable accommodations, then it did not develop an appropriate treatment plan or make reasonable efforts[4] to reunite the family.[5] The ADA does not require the district court to make additional findings under the ADA during dependent neglect proceedings.[6] Rather, the District Court must consider

---

[4] Or active efforts under ICWA, 25 U.S.C. § 1912(d).

[5] In their technical assistance to state agencies on the ADA in dependent neglect proceedings, the U.S. Department of Health and Human Services and U.S. Department of Justice explain:

> Agencies should take steps to ensure, for example, that investigators, social workers, supervisors, and others base their assessments of and decisions regarding individuals with disabilities on actual facts that pertain to the individual person, and not on assumptions, generalizations, fears, or stereotypes about disabilities and how they might manifest. The child welfare agency's obligation to ensure individualized assessments applies at the outset and throughout any involvement that an individual with a disability has with the child welfare system.

U.S. Dep't of Health & Human Servs. & U.S. Dep't of Justice, *Protecting the Rights of Parents and Prospective Parents with Disabilities: Technical Assistance for State and Local Child Welfare Agencies and Courts under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act* (Aug. 2015), https://perma.cc/H3WE-JZ3R. This dovetails with the requirements of Title 41, chapter 3, MCA, to provide reasonable efforts and to develop an appropriate treatment plan and our precedence in this regard. *In re D.B.*, ¶ 37; *In re R.L.*, ¶ 22.

[6] The technical assistance from the U.S. Department of Health and Human Services and U.S. Department of Justice explains the ADA does not require separate findings from a district court, rather:

> Given the responsibilities of agencies discussed above, we also recommend that courts consider whether parents and prospective parents with disabilities have been afforded an equal opportunity to attain reunification, including whether they have been provided with appropriate services and supports and other reasonable modifications to enable them to participate fully and meaningfully in family preservation efforts. Additionally, we suggest that courts consider whether any reasonable modifications are necessary and should be made for parents with

15

accommodation for the parent's disability in making findings required under Title 41, chapter 3, MCA, during the pendency of the dependent neglect case. *See In re D.B.*, ¶ 34 ("Where the case involves a disabled parent or child, it is especially important to determine whether the plan 'takes into consideration the particular problems facing both the parent and the child.'" (quoting *In re A.N.*, ¶ 27)); *In re J.B.K.*, ¶ 28.

¶26   Questions of whether the Department has complied with the statutory requirements of the ADA and Section 504 are intertwined with whether the Department has fulfilled its duties under Title 41, chapter 3.[7]   Because the statutes governing dependent neglect cases require individualized treatment plans and reasonable efforts to provide services that must accommodate the issues facing the parent and child, such as the parent's disability, meeting the requirements of the state statutes necessarily requires the Department to have complied with the requirements of the ADA.   The District Court need not make specific findings under the ADA and Section 504 when terminating parental rights.

¶27   *2. Whether the District Court erred when it terminated Mother's parental rights under § 41-3-609, MCA, and 25 U.S.C. § 1912.*

---

disabilities.   We also recommend that courts consider evidence concerning the manner in which the use of adaptive equipment or supportive services may enable a parent with disabilities to carry out the responsibilities of parenting.

U.S. Dep't of Health & Human Servs. & U.S. Dep't of Justice, *Protecting the Rights of Parents and Prospective Parents with Disabilities: Technical Assistance for State and Local Child Welfare Agencies and Courts under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act* (Aug. 2015), perma.cc/H3WE-JZ3R.

[7] The ADA also provides a parent with additional remedies if the Department is violating the requirements of the ADA, such as filing suit in federal court or filing a complaint with the U.S. Department of Justice or U.S. Department of Health and Human Services.  *See* 42 U.S.C. § 12133; 28 C.F.R. § 35.170.

¶28 Mother challenges whether she received active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of her family as required under 25 U.S.C. § 1912(d). Mother alleges two specific failures to reasonably accommodate her disability under the requirements of the ADA, which she maintains demonstrates a lack of active efforts on the part of the Department: (1) insufficient visitation opportunities with the children; and (2) insufficient access to services such as PCIT and individual therapy. Mother thus argues the District Court also erred in finding the condition rendering her unfit was unlikely to change in a reasonable time under § 41-3-609(1)(f)(ii), MCA, because the Department failed to provide her with active efforts to reunite with K.L.N. Mother further contends the Department presented insufficient evidence for the District Court to conclude she was unlikely to change within a reasonable time or her continued custody of K.L.N. would likely result in serious emotional or physical damage to K.L.N. under 25 U.S.C. § 1912(f). Mother does not challenge the appropriateness of her treatment plan on appeal or the District Court's conclusion the plan was unsuccessful.[8]

¶29 While Mother highlights the testimony of her two providers at the termination hearing, opining additional and more frequent counseling sessions could benefit someone with FASD, she points to no time in the record where she asked for or her providers recommended the Department to approve additional therapy sessions and the Department

---

[8] Amicus Disability Rights Montana argued in its brief that Mother's treatment plan was not appropriate. An amicus generally cannot raise an issue not raised by the parties. *Reichert v. State*, 2012 MT 111, ¶¶ 25-26, 365 Mont. 92, 278 P.3d 455.

denied the request.[9]  At status hearings, her counsel reported Mother was doing well and progressing.  At these hearings, Mother did not seek the court's aid in receiving additional services to help her in gaining the skills needed to safely parent her children.  The Department set Mother up with service providers experienced in working with parents with FASD and their needs.  When Savage suggested Mother engage in individual counseling, the Department set up individual counseling with Meyers.  At the termination hearing, these providers testified Mother was not currently capable of safely parenting K.L.N. on her own and did not think she would be able to gain such capacity to care for K.L.N. in the long term, even with more frequent services or services extended for a longer period.  On appeal, Mother argues the Department should have provided additional sessions with her therapists and allowed her more time to attempt to gain the capacity to safely parent K.L.N. on her own.

---

[9] Mother argues the Department opposed her efforts to obtain further assistance and reasonable accommodations when it opposed her December 9, 2019 Motion for Court Ordered Alternative Dispute Resolution, filed after termination proceedings had begun.  This motion did not seek additional services for Mother.  Rather, it sought an order from the court mandating mediation between the parties to discuss a guardianship.  Mother contended the court should order mediation because the Department could not meet its burden to show it provided her with active efforts before terminating her parental rights.  Mother alleged the Department failed to provide active efforts under ICWA and reasonable accommodations under the ADA and Section 504 because she had "not been offered services or parenting assessments specifically tailored to treat" her FASD "through the help of neuropsychologists or people specifically specialized to treat" FASD.  As the Department pointed out in its response, Mother's treatment plan and services already took her known disability into account and it was providing active efforts.  The District Court declined to order mediation between the parties.  At the May 1, 2020 termination hearing, the District Court determined there was no "evidentiary basis to consider guardianship in this case" and guardianship would be contrary to the children's best interests.

¶30     The Department provided Mother with services that took her disability into account over a lengthy period of time.  Based on the testimony from her providers, there are no accommodations of more or increased frequency that could result in Mother gaining and retaining the requisite parenting skills to meet the daily needs of K.L.N. on a long-term basis.  The ADA requires the Department to provide *reasonable* accommodations and state statute requires the court to consider whether the parent is likely to change in a *reasonable* time.  The Department provided Mother with services that took her disability into account. The court then appropriately took Mother's "concerns and disabilities into account" in analyzing the statutory requirements and reaching its decision to terminate Mother's parental rights.  After considering all the testimony presented, the Court did not err in concluding the Department provided Mother with active efforts and the conduct or condition preventing Mother from safely parenting her child would not change in a reasonable time.

¶31     Sufficient evidence also supported the District Court's finding K.L.N. would likely suffer serious emotional or physical damage if returned to Mother's care.  In addition to Savage's testimony Mother was not able to safely parent K.L.N., the District Court also relied on the testimony from the QEW, who specifically testified K.L.N. would likely suffer serious emotional or physical damage if returned to Mother's care.

¶32     *3. Whether the District Court erred when it adjudicated K.L.N. as a YINC without applying ICWA.*

¶33     Mother argues the District Court failed to comply with the minimum requirements of ICWA when adjudicating K.L.N. as a YINC and then relied on that improper

19

adjudication to fulfill the criteria for termination. She maintains these failures require invalidation of the termination of her parental rights to K.L.N.

¶34 When a party seeks to place an Indian child in foster care or terminate parental rights, ICWA mandates a higher burden of proof and two additional statutory criteria: active efforts and a determination the continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child supported by testimony from a QEW. 25 U.S.C. § 1912(d)-(f). Under ICWA "any parent . . . from whose custody such [Indian] child was removed . . . may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of section [1911, 1912, and 1913] of this title." 25 U.S.C. § 1914. ICWA does not require invalidation of the action, but rather "[u]pon a showing that an action for foster-care placement or termination of parental rights violated any provision of 25 U.S.C. 1911, 1912, or 1913, the court must determine whether it is appropriate to invalidate the action." 25 C.F.R. § 23.137(b). Thus "alleged violations of [ICWA] in the temporary custody proceedings would not require invalidation of the permanent custody proceedings." *In re M.E.M.*, 209 Mont. 192, 195, 679 P.2d 1241, 1243 (1984).

¶35 The District Court granted TLC to the Department without testimony from a QEW and did not rely on the clear and convincing evidence standard in its adjudication as required by 25 U.S.C. § 1912(e). This Court must therefore determine whether it is appropriate to invalidate the permanent custody proceedings based on these failures as Mother contends. Under the facts of this case, we determine it is not. Mother stipulated

20

to adjudication of K.L.N. as a YINC and to TLC. At no point during the proceedings before the District Court did she object to the adjudication proceedings or the grant of TLC to the Department. In fact, Mother stipulated to the extension of TLC. At the termination hearing, the Department presented testimony from a QEW that returning K.L.N. to Mother's care would result in serious emotional or physical damage to K.L.N. The court then determined, based on evidence beyond a reasonable doubt, the Department provided active efforts to Mother and returning K.L.N. to Mother's care would likely result in serious emotional or physical damage to the child. While the District Court did rely on the previous adjudication to fulfill the criteria for termination, we do not believe the prior violations require the invalidation of the permanent custody proceedings under the facts of this case.

¶36 The District Court did not err in terminating Mother's rights under state and federal law.

## CONCLUSION

¶37 The District Court is affirmed.

/S/ INGRID GUSTAFSON

We concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ DIRK M. SANDEFUR

21