DA 23-0414

IN THE SUPREME COURT OF THE STATE OF MONTANA

2024 MT 22N

IN THE MATTER OF:

T.K.B. and N.Z.B.,

Youths in Need of Care.

APPEAL FROM:   District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause Nos. DN 21-150
and DN 20-219
Honorable Michael G. Moses, Presiding Judge

COUNSEL OF RECORD:

For Appellant M. B. (Mother):

Laura Reed, Attorney at Law, Missoula, Montana

For Appellant H. E. (Father):

Shannon Hathaway, Hathaway Law Group, Missoula, Montana

For Appellee:

Austin Knudsen, Montana Attorney General,, Bjorn Boyer, Assistant
Attorneys General, Helena, Montana

Scott Twito, Yellowstone County Attorney, Laura Watson, Deputy County
Attorney, Billings, Montana

Submitted on Briefs:  January 17, 2024

Decided:  February 6, 2024

Filed:

_____
Clerk

Justice James Jeremiah Shea delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion, shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 M.B. (Mother) appeals from the Thirteenth Judicial District Court orders terminating her parental rights to T.K.B. and N.Z.B. H.E. (Father) appeals the order terminating his parental rights to T.K.B.[1] We affirm.

¶3 After nearly three years of reports regarding possible physical neglect, drug use and violence in the presence of the children, and failure to accommodate the medical needs of a child born prematurely, the Department of Public Health and Human Services, Child and Family Services Division (the Department) removed N.Z.B. from Mother's care on August 17, 2020. The removal came shortly after N.Z.B.'s infant half sibling, R.E., died suddenly while in Mother's care on August 10, 2020.

¶4 On August 24, 2020, in response to reports that N.Z.B. was in danger of abuse or neglect after the death of R.E., the Department petitioned for Emergency Protective Services (EPS), Adjudication as a Youth in Need of Care (YINC) and Temporary Legal Custody (TLC) of N.Z.B. The District Court granted the Petition the following day. On November 4, 2020, N.Z.B. was adjudicated a YINC by stipulation. A treatment plan for Mother was approved by the District Court on December 21, 2020.

---

[1] Father is T.K.B.'s parent only. N.Z.B.'s biological father relinquished his parental rights and is not a party to this appeal.

¶5 While the proceedings involving N.Z.B. were pending, T.K.B. was born. The Department's involvement with T.K.B. began immediately after the child's birth, when hospital staff expressed concerns regarding Mother's ability to adequately care for the child's particular medical needs. The Department placed T.K.B. into emergency protective custody on May 18, 2021, but allowed the child to remain with Mother pursuant to a protection plan regarding T.K.B. signed by Mother the same day. While the proceedings involving T.K.B. were ongoing, the Department attempted to include Father, who refused to engage with the Department until October of 2021, when a paternity test confirmed that he was T.K.B.'s biological father.

¶6 Mother showed signs of progress toward completing her treatment plan until August 16, 2021, when she was involved in a public altercation with the mother of one of Father's other children. Both T.K.B. and N.Z.B. were present at this altercation, as was Father's other child. Several days later, Mother was arrested and charged with assault and assault on a minor; Father's other child and the child's mother were named as the victims.[2] Before Mother was arrested, she had returned N.Z.B. to his placement and left T.K.B. with a friend. Upon Mother's arrest, the Department attempted to locate T.K.B., but was unable to do so for more than two days. Shelby Goodman, a Child Protection Specialist Supervisor at the Department, testified that the Department's efforts to find T.K.B. involved seeking the assistance of law enforcement, and that law enforcement was about to issue an Amber alert when T.K.B. was found on the doorstep of Mother's residence.

---

[2] Mother pled guilty to these charges, as well as a previous, unrelated assault.

¶7　As a result of Mother's arrest and the difficulties locating T.K.B., the Department removed T.K.B. from Mother's care. The Department was unable to place T.K.B. with Father because Father was not on T.K.B.'s birth certificate and refused to engage with the Department without DNA confirmation of paternity, and due to the Department's concerns regarding Father's history of domestic violence.

¶8　After T.K.B.'s removal, the relationship between the Department and both parents deteriorated and the Department's concerns regarding both parents' anger issues intensified. Due to safety concerns, the Department began sending two workers to Mother's home to investigate Mother's compliance with the Department's conditions for allowing the children back into her home. CPSS Goodman testified that the primary concern, however, was Mother's association with unsafe people, especially Father, who was the subject of a no contact order due to his violence against Mother.

¶9　Upon receiving news of paternity confirmation in October of 2021, Father insisted that T.K.B. should be placed in his care. Father and his grandmother both yelled at and threatened CPSS Goodman on the phone when she informed them that T.K.B. could not be immediately placed with Father. CPSS Goodman reported that both became aggressive, with one stating "I have pictures of you bitch."

¶10　Mother entered a Phase II treatment plan and Father entered a Phase I treatment plan, both approved by the District Court, on January 12, 2022. Throughout the following months, both Mother and Father were largely unresponsive to the Department's attempts to address problems with the parents' anger and living situations. Mother missed at least

six visits with the children and Father failed to engage the Department in any capacity or complete any work on his treatment plan tasks for several months.

¶11 On March 4, 2022, Mother and her attorney met with CPSS Goodman to discuss steps toward reunification with the children. CPSS Goodman informed Mother that, among other conditions, she needed to find a reliable living situation, re-engage with SafeCare programming, consistently show up for visits, and complete anger management. By April, CPSS Goodman received word that Mother's living situation had again changed and that she had been spending a significant amount of time with Father despite the Department's repeated concerns about their violent relationship.

¶12 After Mother became pregnant with another child, she reported that her physician had ordered bed rest and activity restrictions. The Department's third-party visitation coordinator sought doctor confirmation of Mother's medical restrictions so they could accommodate those restrictions and adapt visitation plans, which Mother never provided.

¶13 The Department petitioned for termination of parental rights as to both children on June 28, 2022. The petition listed 17 different "reasonable efforts" undertaken by the Department to avoid placement and reunify the parents and children. The petition listed the conditions in both parents' treatment plans, noting Mother had not complied with at least four of eight tasks and Father had not complied with at least five of eleven tasks required under their respective plans. The District Court conducted the termination hearing over the course of five days, after which it granted the Department's petitions.[3]

---

[3] The proceedings below took place under separate cause numbers. Upon Mother's motion, the cases were consolidated on appeal.

¶14    On appeal of a district court's parental termination order, the court's factual findings are reviewed for clear error and its conclusions of law are reviewed de novo for correctness. *In re M.J.*, 2013 MT 60, ¶ 16, 369 Mont. 247, 296 P.3d 1197 (citation omitted).  The district court's "ultimate decision regarding adjudication and disposition" in a parental termination action is reviewed for an abuse of discretion.  *In re M.J.*, ¶ 16.

¶15    We reframe the parties' issues on appeal and address: (1) whether the Department provided reasonable efforts to reunify the parties and the children;[4] (2) whether the District Court erred in determining the conduct or condition rendering Mother and Father unfit to parent was unlikely to change within a reasonable time; and (3) whether Mother and Father received ineffective assistance of counsel.

Reasonable Efforts

¶16    A party seeking to terminate parental rights has the burden to prove by clear and convincing evidence that: (1) a child has been adjudicated as a YINC; (2) an appropriate, court-approved treatment plan has not been complied with by the parent or has not been

---

[4] Mother claims on appeal that the Department failed to comply with §§ 504 and 1557 of the Rehabilitation Act, and 29 U.S.C. § 794 when it denied Mother's requests for pregnancy-related accommodations.  The State argues Mother waived her disability accommodation claims by failing to raise them before the District Court.  We have held that "the District Court must consider accommodation for the parent's disability in making findings required under Title 41, chapter 3, MCA, during the pendency of the dependent neglect case."  *In re K.L.N.*, 2021 MT 56, ¶ 25, 403 Mont. 342, 482 P.3d 650 (citation omitted).  We further explained that "[b]ecause the statutes governing dependent neglect cases require individualized treatment plans and reasonable efforts to provide services that must accommodate the issues facing the parent and child, such as the parent's disability, meeting the requirements of the state statutes necessarily requires the Department to have complied" with those statutes.  *In re K.L.N.*, ¶ 26.  Because compliance with the disability accommodation statutes is subsumed within the determination that the Department engaged in reasonable efforts to reunify Mother and the children, we address Mother's claims under that prong of our analysis.

successful; and (3) the conduct or condition of the parent rendering them unfit is unlikely to change within a reasonable time. *In re C.M.*, 2019 MT 227, ¶ 16, 397 Mont. 275, 449 P.3d 806 (citation omitted). While not a separate requirement for termination of parental rights, the Department must nevertheless provide reasonable efforts to reunify separated families before the court can conclude the conduct or condition of the parent is unlikely to change. *In re K.L.N.*, ¶ 18 (citation omitted). "Reasonable efforts require the provision of services 'reasonably designed to address the parent's treatment and other needs precluding the parent from safely parenting.'" *In re K.L.N.*, ¶ 18 (citation omitted).

¶17 The District Court explained in its order terminating Mother's parental rights to the children that:

> Natural mother's conduct and/or conditions rendering her unfit, unable or unwilling to give the children adequate parental care include but are not limited to the following: emotional illness, mental illness, mental deficiency of the duration or nature as to render her unlikely to care for the ongoing physical, mental, or emotional needs of these children within a reasonable time.

The District Court noted Mother's recent history of violence against others and her continued involvement with violent individuals. The District Court also relied on Mother's extensive history of missed visits with the children, which culminated in two third-party family service providers discontinuing services to her; months of delays and missed appointments for clinical evaluations and treatment; a pattern of conflict with Department employees; refusal to engage in accommodations such as video visits with the children or Department-provided bus passes; and unwavering blame of the Department for her own noncompliance.

¶18 The District Court made detailed findings regarding the Department's efforts in this case. Testimony established that Mother received significant leniency regarding her missed visits. The Department allowed T.K.B. to stay in Mother's care, despite significant concerns about the unique health complications of a child born prematurely and her ability to accommodate the child's needs. The Department continued to engage with Mother despite repeated conflicts, even after the Department had to transfer the case to CPSS Goodman and dispatch multiple workers to Mother's home because of safety concerns.

¶19 Under the parental termination criteria, "a district court must look to a parent's past behavior as a predictor of future behavior in determining whether the parent's conduct or condition is likely to change within a reasonable time." *In re C.B.*, 2014 MT 4, ¶ 23, 373 Mont. 204, 316 P.3d 177 (citation omitted). The obligation to engage in efforts to reunify is not borne only by the Department. *See In re C.B.*, ¶ 23. The District Court did not abuse its discretion in determining Mother's conduct or condition was unlikely to change within a reasonable time, and this determination is supported by the Department's extensive efforts over multiple years to equip Mother with the tools needed to care for all her children.

¶20 Father claims the Department failed to engage in reasonable efforts to reunite him with T.K.B. because of the Department's purported lack of meaningful communication and because the Department sought termination so soon after his treatment plan was approved. The District Court rejected these claims in its termination order, stating "[t]he record is replete with [Father's] attitude particularly his threatening attitude toward the Department, care providers, visitation providers and a refusal by a counselor, after the initial visit, to

continue counseling with [Father] because of [Father]." Throughout the proceedings, the concerns regarding Father's anger, history of violence against Mother in the presence of children, and other criminal activity[5] persisted without remedy.

¶21 The court also found that, regardless of any communication shortcomings, Father was aware of and understood his treatment plan by December 1, 2021. Substantial evidence supports this finding. It is undisputed that, even though Father made progress on some of his treatment plan tasks, months went by before he even began to engage with the Department's services and the treatment plan remained largely incomplete by April 2023, when the final termination hearing was held. Further, multiple witnesses testified that Father had not made satisfactory progress in addressing concerns with respect to his ability to safely parent T.K.B. Regarding concerns over Father's anger, the District Court noted that while Father did obtain a domestic violence assessment, he had not followed the recommendations from that evaluation. The District Court's determination that, among other concerns, it was Father's lack of meaningful engagement and progress toward his treatment goals, rather than the Department's, that justified termination finds adequate support in the record.

---

[5] At the time of termination, Father was facing a criminal charge for a sexual offense. Regarding the pending criminal charge, testimony at the hearing was that "[Father] denied exchanging marijuana for sex, denied sex with the alleged victim, but did report having given marijuana to the 15-year-old girl."

<u>Assistance of counsel</u>

¶22 In termination proceedings, parents have a due process right to effective assistance of counsel. *In re K.B.*, 2016 MT 73, ¶ 16, 383 Mont. 85, 368 P.3d 722 (citation omitted). "Whether assistance was effective requires review of counsel's training, experience, and advocacy." *In re K.B.*, ¶ 16 (citation omitted). "Ineffective assistance of counsel requires reversal only if the parent suffered prejudice." *In re K.B.*, ¶ 16 (citation omitted).

¶23 Mother claims her counsel was ineffective because of his failure to obtain a separate anger assessment. Assuming for the sake of argument that Mother's counsel was deficient in some way, Mother has failed to demonstrate any prejudice. The anger assessment performed by Michael Sullivan was neither particularly harsh nor vulnerable to impeachment based on the corroborating facts in the record. Mother engaged in a pattern of contemptuous relationships with the Department and its employees, conflicts with placements, conflicts with cohabitants requiring Mother to change residences frequently, and physical violence culminating in three misdemeanor assault convictions arising from two separate incidents in the presence of the children. In light of this record, Mother was not prejudiced by the lack of a separate anger assessment.

¶24 Father's claim of ineffective assistance based on his initial attorney's alleged failure to adequately communicate with him is similarly unavailing. Father rebuffed any attempts by the Department to get involved in the case initially. Upon informing Father of the DNA confirmation of his paternity, Department employees reported anger and threats by Father. The District Court found that Father refused to return phone calls and text messages from

reunification services for nearly six months after he received confirmation of his paternity, and substantial evidence from testimony at trial supports this finding. Finally, we note that the District Court's determination that Father's conduct or condition rendering him unfit to parent T.K.B. relied heavily on Father's lack of engagement and progress with his treatment plan well after he obtained new counsel.

¶25 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review.

¶26 Affirmed.

/S/ JAMES JEREMIAH SHEA

We Concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR

11